ORAL ARGUMENT HAS NOT BEEN SCHEDULED

No. 12-1340

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

WEST DEPTFORD ENERGY, LLC,

*Petitioner,*

v.

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent.*

_____

## OPENING BRIEF OF PETITIONER

_____

Neil L. Levy                          Ashley C. Parrish
Stephanie L. Lim                      *Counsel of Record*
KING & SPALDING LLP                   Matthew S. Owen
1700 Pennsylvania Avenue, N.W.        Karen F. Grohman
Washington, D.C.  20006               KING & SPALDING LLP
Telephone: (202) 737-0500             1700 Pennsylvania Avenue, N.W.
Facsimile: (202) 626-3737             Washington, D.C.  20006
Email: nlevy@kslaw.com                Telephone: (202) 626-2627
Email: slim@kslaw.com                 Facsimile: (202) 626-3737
                                      Email: aparrish@kslaw.com
                                      Email: mowen@kslaw.com
                                      Email: kgrohman@kslaw.com

*Counsel for West Deptford Energy, LLC*

DATED: December 11, 2012

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**A.    Parties, Intervenors, and Amici**

The following is a list of all parties, intervenors, and *amici curiae* who have appeared before this Court in this appeal:

> Federal Energy Regulatory Commission
>
> FPL Energy Marcus Hook, L.P.
>
> PJM Interconnection, L.L.C.
>
> West Deptford Energy, LLC

The following is a list of all parties, intervenors, participants, and *amici* who appeared before the Federal Energy Regulatory Commission in the underlying administrative proceedings:

> Federal Energy Regulatory Commission
>
> FPL Energy Marcus Hook, L.P.
>
> NextEra Energy Generators
>
> PJM Interconnection, L.L.C.
>
> West Deptford Energy, LLC

**B.    Rulings Under Review**

The two orders under review are:

> *PJM Interconnection, L.L.C.*, Order Accepting Interconnection Service Agreements, Docket No. ER11-4073-000, 136 FERC ¶ 61,195 (Sept. 16, 2011) (JA __); and

*PJM Interconnection, L.L.C.*, Order Denying Rehearing, Docket No. ER11-4073-001, 139 FERC ¶ 61,184 (June 7, 2012) (JA __).

## C.    Related Cases

This case has not previously been before this Court or any other court.  Counsel is unaware of any other cases currently pending in this Court or in any other court related to this case.  Unrelated issues concerning the same underlying transmission system network upgrades were previously addressed by this Court in *FPL Energy Marcus Hook, L.P. v. FERC*, 430 F.3d 441 (D.C. Cir. 2005).

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Rule 26.1 of the Rules of this Court, petitioner West Deptford Energy, LLC ("West Deptford") states as follows:

West Deptford is the lessee of a 738 megawatt (nominal) natural gas-fired, combined-cycle electric generating facility in West Deptford Township, New Jersey, which is owned by West Deptford Energy Associates Urban Renewal, L.P. ("West Deptford Urban Renewal"). The generating facility will interconnect with the transmission system operated by PJM Interconnection, L.L.C. ("PJM"). West Deptford will be responsible for the operation of the generating facility once it is completed.

West Deptford and West Deptford Urban Renewal are wholly owned indirect subsidiaries of WDE Partners, L.P. ("WDE Partners"), which is a Delaware limited partnership managed by West Deptford GP, LLC ("West Deptford GP"), its general partner. West Deptford GP is, in turn, a wholly owned indirect subsidiary of LS Power Associates, L.P. ("LSP Associates"), which is a Delaware limited partnership managed by LS Power Development, LLC ("LS Power"), its general partner.

iii

LS Power is a power generation and transmission developer with a proven track record of successful project development, operations management, and commercial execution. LS Power has been involved in the development, construction, or operation of over 20,000 megawatts of power generation throughout the United States.

None of West Deptford, West Deptford Urban Renewal, WDE Partners, West Deptford GP, LSP Associates, or LS Power is publicly held or publicly traded. No publicly traded company currently owns 10% or more of West Deptford, West Deptford Urban Renewal, WDE Partners, West Deptford GP, LSP Associates, or LS Power.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................. iii

TABLE OF AUTHORITIES ........................................................ vii

GLOSSARY OF TERMS ........................................................... xiii

JURISDICTIONAL STATEMENT ..................................................... 1

STATUTORY AND REGULATORY PROVISIONS ................................... 1

STATEMENT OF ISSUES ......................................................... 2

STATEMENT OF CASE AND FACTS ......................................... 4

    A.    Regulatory Framework .............................................. 6

    B.    PJM's Interconnection Procedures ................................ 9

    C.    Factual Background .................................................. 15

SUMMARY OF ARGUMENT ..................................................... 27

STANDING ...................................................................... 29

STANDARD OF REVIEW ......................................................... 29

ARGUMENT .................................................................... 31

I.    The Commission's Orders Violate The Filed Rate Doctrine And The Related Statutory Requirements. .................................... 31

    A.    The Statute Prohibits Regulated Entities From Imposing Any Charge Not Reflected In The Filed Rate. ....... 31

    B.    The Limited "Notice" Exception To The Filed Rate Doctrine Does Not Apply. ...................................... 36

    C.    The "Notice" Provided Was Not Legally Adequate. ............... 40

II.    The Commission's Orders Violate The Requirements Of Reasoned Decision-making. ............................................. 44

A.   The Commission's Orders Depart From Precedent Without Any Reasoned Explanation.........................................44

B.   The Commission's Orders Do Not Reasonably Respond To West Deptford's Objections..................................................50

CONCLUSION ...............................................................................55

CERTIFICATE OF COMPLIANCE

ADDENDUM

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*American Tel. & Tel. Co. v. Cent. Office Tel., Inc.,
  524 U.S. 214 (1998) ................................................................. 33

*Arkansas La. Gas Co. v. Hall,
  453 U.S. 571 (1981) ........................................................... 32, 36

Associated Gas Distribs. v. FERC,
  893 F.2d 349 (D.C. Cir. 1989) ................................................. 35

Borough of Ellwood City v. FERC,
  583 F.2d 642 (3d Cir. 1978) ................................................... 32

Burlington Res. Inc. v. FERC,
  513 F.3d 242 (D.C. Cir. 2008) ................................................. 33

California ex rel. Lockyer v. Dynegy, Inc.,
  375 F.3d 831 (9th Cir. 2004) .................................................. 33

Canadian Ass'n of Petroleum Producers v. FERC,
  254 F.3d 289 (D.C. Cir. 2001) ................................................ 38

Chevron U.S.A. Inc. v.
  Natural Resources Defense Council Inc.,
  467 U.S. 837 (1984) .............................................................. 29

Christopher v. SmithKline Beecham Corp.,
  132 S. Ct. 2156 (2012) .......................................................... 42

*City of Anaheim v. FERC,
  558 F.3d 521 (D.C. Cir. 2009) ................................................ 37

Consolidated Edison Co. of N.Y., Inc. v. FERC,
  347 F.3d 964 (D.C. 2003) ....................................................... 37

Detroit Edison Co. v. FERC,
  334 F.3d 48 (D.C. Cir. 2003) .................................................. 29

\* Authorities upon which we chiefly rely are marked with asterisks

*Entergy Servs., Inc. v. FERC,
   319 F.3d 536 (D.C. Cir. 2003) .................................................... 12, 15, 51

Environmental. Def. Fund, Inc. v. Costle,
   657 F. 2d 275 (D.C. Cir. 1981) ................................................. 44

Exxon Mobil Corp. v. FERC,
   571 F.3d 1208 (D.C. Cir. 2009) ........................................... 33, 49

*FCC v. Fox Television Stations, Inc.,
   556 U.S. 502 (2009) ................................................................ 30, 44

Florida Gas Transmission Co. v. FERC,
   604 F.3d 636 (D.C. Cir. 2010) .................................................. 30

*FPL Energy Marcus Hook, L.P. v. FERC,
   430 F.3d 441 (D.C. Cir. 2005) ....................................10, 11, 16, 17, 18, 46

Gates & Fox Co. v.
   Occupational Safety & Health Review Comm'n,
   790 F.2d 154 (D.C. Cir. 1986) .................................................. 42

General Dynamics Land Sys. Inc. v. Cline,
   540 U.S. 581 (2004) .................................................................. 30

Kloeckner v. Solis,
   568 U.S. __ (Dec. 10, 2012) (slip op.) ...................................... 52

Lechmere, Inc. v. NLRB,
   502 U.S. 527 (1992) .................................................................. 30

Louisville & Nashville R.R. Co. v. Maxwell,
   237 U.S. 94 (1915) ................................................................... 32

Lujan v. Defenders of Wildlife,
   504 U.S. 555 (1992) .................................................................. 29

Montana-Dakota Utils. Co. v. Nw. Pub. Serv. Co.,
   341 U.S. 246 (1951) ................................................................... 6

*Motor Vehicle Mfrs. Ass'n v.
  State Farm Mut. Auto. Ins. Co.,
  463 U.S. 29  (1983) .......................................................... 30, 50

National Cable & Telecomms. Ass'n v.
  Brand X Internet Servs.,
  545 U.S. 967 (2005) .............................................................. 30

Natural Gas Clearinghouse v. FERC,
  965 F.2d 1066 (D.C. Cir. 1992) ....................................... 25, 37

New York v. FERC,
  535 U.S. 1 (2002) ..................................................................... 8

New York, New Haven & Hartford R.R. Co. v. ICC,
  200 U.S. 361 (1906) .............................................................. 34

NRG Power Mktg., LLC v. Maine PUC,
  130 S. Ct. 693 (2010) .............................................................. 6

*NSTAR Elec. & Gas Corp. v. FERC,
  481 F.3d 794 (D.C. Cir. 2007) .............................. 32, 33, 38, 40

OXY USA Inc. v. FERC,
  64 F.3d 679 (D.C. Cir. 1995) ............................................... 37

Towns of Concord, Norwood, and
  Wellesley, Mass. v. FERC,
  955 F.2d 67 (D.C. Cir. 1992) ................................................ 32

Transmission Access Policy Study Grp. v. FERC,
  225 F.3d 667 (D.C. Cir. 2000) ................................................ 7

United States v. Home Concrete & Supply, LLC,
  132 S. Ct. 1836 (2012) .......................................................... 30

Williams Gas Processing-Gulf Coast Co., L.P. v. FERC,
  475 F.3d 319 (D.C. Cir. 2006) .............................................. 44

**Administrative Rules and Cases**

*Arizona Pub. Serv. Co.,*
    137 FERC ¶ 61,099 (2011) ..................................................................... 43

*Carolina Power & Light Co.,*
    94 FERC ¶ 61,273 (2001) ....................................................................... 42

*Critical Path Transmission LLC v.*
    *California Indep. Sys. Op. Corp.,*
    135 FERC ¶ 61,031 (2011) ..................................................................... 48

*Dominion Res. Servs. Inc. v. PJM Interconnection, L.L.C.,*
    123 FERC ¶ 61,025 (2008) ............................................................... 10, 19

*Edison Mission Energy v.*
    *Midwest Indep. Transmission Sys. Operator, Inc.,*
    136 FERC ¶ 61,035 (2011) ..................................................................... 43

*El Paso Elec. Serv. Co.,*
    137 FERC ¶ 61,101 (2011) ..................................................................... 43

*FPL Energy Marcus Hook, L.P. v.*
    *PJM Interconnection, L.L.C.,*
    107 FERC ¶ 61,069 (2004) ..................................................................... 17

*FPL Energy Marcus Hook, L.P. v.*
    *PJM Interconnection, L.L.C.,*
    108 FERC ¶ 61,171 (2004) ..................................................................... 17

**FPL Energy Marcus Hook, L.P. v.*
    *PJM Interconnection, L.L.C.,*
    118 FERC ¶ 61,169 (2007) ........................................................... 18, 46, 51

*FPL Energy Marcus Hook, L.P. v.*
    *PJM Interconnection, L.L.C.,*
    123 FERC ¶ 61,289 (2008) ............................................................... 18, 47

*Interconnecting Queuing Practices,*
    122 FERC ¶ 61,252 (2008) ..................................................................... 49

*MidAmerican Energy Co.,*
   116 FERC ¶ 61,018 (2006) ...................................................................... 46

*Midwest Indep. Transmission Sys. Operator, Inc.,*
   124 FERC ¶ 61,183 (2008) ...................................................................... 42

\*_Midwest Indep. Transmission Sys. Operator, Inc.,_
   129 FERC ¶ 61,060 (2009) ......................................................... 23, 35, 45

*Midwest Indep. Transmission Sys. Operator, Inc.,*
   131 FERC ¶ 61,165 (2010) ...................................................................... 45

\*_Midwest Indep. Transmission Sys. Operator, Inc.,_
   138 FERC ¶ 61,199 (2012) ................................................... 4, 28, 35, 45

*PJM Interconnection, L.L.C.,*
   108 FERC ¶ 61,025 (2004) ...................................................................... 45

*PJM Interconnection, L.L.C.,*
   136 FERC ¶ 61,195 (2011) ......................................... 1, 20, 22, 24, 25, 53

*PJM Interconnection, L.L.C.,*
   139 FERC ¶ 61,184 (2012) ................................... 1, 15, 16, 19, 21, 25, 26,
                                                                                   35, 36, 40, 47, 53

*Promoting Wholesale Competition Through Open Access*
   *Non-discriminatory Transmission Servs. by Pub. Utils.,*
   Order No. 888,
   61 Fed. Reg. 21,540 (May 10, 1996) ........................................................ 8

*Regional Transmission Orgs.,*
   Order No. 2000,
   65 Fed. Reg. 810 (Jan. 6, 2000) ............................................................... 8

*Shetek Wind Inc. v.*
   *Midwest Indep. Transmission Sys. Operator Inc.,*
   138 FERC ¶ 61,250 (2012) ...................................................................... 45

*Standardization of Generator Interconnection
    Agreements and Procedures,*
    Order No. 2003,
    FERC Stats. & Regs. ¶ 31,146 (2003) ..........................................9, 14, 51

## Statutes

*16 U.S.C. § 824 ................................................................................ 7, 42

*16 U.S.C. § 824d ....................................................................6, 7, 31, 32

16 U.S.C. § 824e ................................................................................... 7

5 U.S.C. § 706 .................................................................................... 30

## Rules and Regulations

18 C.F.R. § 35.1 ................................................................................... 6

## Other Authorities

*FPL Energy Marcus Hook, L.P. v.
    PJM Interconnection, L.L.C.,*
    Docket No. EL04-57-000, PJM Response (May 19, 2004) ..................... 52

*PJM Interconnection, L.L.C.,*
    Docket No. EL08-36-000,
    Answer of PJM Interconnection, L.L.C. to Request for
    Clarification of American Municipal Power – Ohio, Inc.
    (Jul. 7, 2008) ........................................................................... 41

*PJM Interconnection, L.L.C.,*
    Docket No. EL08-36-000,
    PJM Reply Comments (Mar. 24, 2008) ...........................................21, 46

PJM Manual 06,
    Financial Transmission Rights (2012) ...............................................51

# GLOSSARY OF TERMS

| | |
|---|---|
| Auction Revenue Rights ("ARRs") | Financial rights given to a generator that has paid for the cost of network upgrades that allows the generator to receive revenue from the sale of transmission rights associated with the upgraded facilities. |
| Commission | Federal Energy Regulatory Commission |
| FERC | Federal Energy Regulatory Commission |
| Independent System Operator ("ISO") | The operator of a regional transmission system that is independent of market participants.  *See* Regional Transmission Organization. |
| Liberty Electric | Liberty Electric Power, LLC |
| Marcus Hook | FPL Energy Marcus Hook |
| *Marcus Hook I* | *FPL Energy Marcus Hook, L.P. v. PJM Interconnection, L.L.C.,* 107 FERC ¶ 61,069 (2004) |
| *Marcus Hook II* | *FPL Energy Marcus Hook, L.P. v. PJM Interconnection, L.L.C.,* 108 FERC ¶ 61,171 (2004) |
| *Marcus Hook III* | *FPL Energy Marcus Hook, L.P. v. PJM Interconnection, L.L.C.,* 118 FERC ¶ 61,169 (2008) |
| *Marcus Hook IV* | *FPL Energy Marcus Hook, L.P. v. PJM Interconnection, L.L.C.,* 123 FERC ¶ 61,289 (2008) |

| | |
|---|---|
| Megawatt (MW) | A measure of real power equal to a million watts. |
| *MISO I* | *Midwest Indep. Transmission Sys. Operator, Inc.,* 129 FERC ¶ 61,060 (2009) |
| *MISO II* | *Midwest Indep. Transmission Sys. Operator, Inc.,* 131 FERC ¶ 61,165 (2010) |
| *MISO III* | *Midwest Indep. Transmission Sys. Operator, Inc.,* 138 FERC ¶ 61,199 (2012) |
| Network Upgrades | Additions, modifications, and upgrades made to the transmission system (*i.e.,* network) at or beyond the Point of Interconnection in order to accommodate the interconnection of a generating facility to the transmission system. |
| Network Upgrade 28 | A nine-year old upgrade on the PJM-operated transmission grid that consists of a 230 kilovolt circuit, along with certain related facilities, placed on what is known as the Mickleton-Monroe transmission line. |

Order No. 888

*Promoting Wholesale Competition Through Open Access Non-discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities*, Order No. 888, 61 Fed. Reg. 21,540 (May 10, 1996), FERC Stats. & Regs. ¶ 31,036 (1996), *order on reh'g*, Order No. 888-A, 62 Fed. Reg. 12,274 (Mar. 14, 1997), FERC Stats. & Regs. ¶ 31,048 (1997), *order on reh'g*, Order No. 888-B, 62 Fed. Reg. 64,688 (Nov. 25, 1997), 81 FERC ¶ 61,248 (1997), *order on reh'g*, Order No. 888-C, 82 FERC ¶ 61,046 (1998), *aff'd in relevant part sub nom. Transmission Access Policy Study Group v. FERC*, 225 F.3d 667 (D.C. Cir. 2000), *aff'd sub nom. New York v. FERC*, 535 U.S. 1 (2002).

Order No. 2003

*Standardization of Generator Interconnection Agreements and Procedures*, Order No. 2003, FERC Stats. & Regs. ¶ 31,146 (Aug. 19, 2003), 104 FERC ¶ 61,103 (2003), *order on reh'g*, Order No. 2003-A, 69 Fed. Reg. 15,932 (Mar. 26, 2004), 106 FERC ¶ 61,220 (2004), *order on reh'g*, Order No. 2003-B, 70 Fed. Reg. 265 (Jan. 4, 2005), 109 FERC ¶ 61,287 (2004), *order on reh'g*, Order No. 2003-C, 70 Fed. Reg. 37,661 (June 30, 2005), 111 FERC ¶ 61,401 (2005).

PJM

PJM Interconnection, L.L.C.

| | |
|---|---|
| PJM Superseded Tariff | The open access transmission tariff that previously set forth the terms and conditions governing new interconnections to the transmission network within PJM's region but has not been filed or in effect since 2008. |
| PJM Tariff | The open access transmission tariff effective and on file with the Commission that sets forth the terms and conditions governing new interconnections to the transmission network within PJM's region. |
| Regional Transmission Organization ("RTO") | An independent entity responsible for the operation of a regional transmission network. *See* Independent System Operator. |
| Tariff | A Commission-approved document stating the rate or rates to be charged by a particular company or utility. |
| West Deptford | Petitioner West Deptford Energy, LLC |

## JURISDICTIONAL STATEMENT

On September 16, 2011, the Commission entered an order accepting an unexecuted interconnection service agreement and interconnection construction service agreement filed by PJM Interconnection, L.L.C. ("PJM"). *PJM Interconnection, L.L.C.*, 136 FERC ¶ 61,195 (2011) (JA__). On June 7, 2012, the Commission denied rehearing. *PJM Interconnection, L.L.C.*, 139 FERC ¶ 61,184 (2012) (JA __). Petitioner West Deptford timely filed a petition for review. This Court has jurisdiction under 16 U.S.C. § 825*l*(b).

## STATUTORY AND REGULATORY PROVISIONS

Relevant statutes and regulations are reproduced in the addendum.

## STATEMENT OF ISSUES

The Commission's orders require West Deptford, as a condition of taking service under an interconnection agreement with PJM Interconnection, LLC, to pay for the cost of a network upgrade made to the electric transmission grid more than nine years ago, even though the controlling terms and conditions of the tariff on file and in effect prohibit allocating that cost to West Deptford.  The issues presented are:

1.     Whether the Commission's orders violate the filed rate doctrine and other requirements of the Federal Power Act by disregarding the filed tariff and imposing a payment obligation based on the terms of a superseded tariff that has not been in effect since 2008.

2.     Whether the Commission's orders are arbitrary and capricious because they —

a.     depart, without reasoned explanation, from precedent establishing that when a generator takes interconnection service, the applicable tariff is the tariff in effect and on file on the date the generator's interconnection agreement is either executed or filed unexecuted with the Commission; and

      b.    fail to provide any reasoned response to West Deptford's objection that it is unduly discriminatory to require it to reimburse third parties that previously paid for the costs of the network upgrade to the extent those parties have already received monetary reimbursement through the exercise of compensatory auction rights.

## STATEMENT OF CASE AND FACTS

This case concerns the filed rate doctrine. The Federal Power Act protects against unjust, unreasonable, or unduly discriminatory rates by prohibiting public utilities from imposing charges that are different from the rates on file with the Federal Energy Regulatory Commission. Accordingly, Commission precedent has recognized that, when an electric generator interconnects its facilities to the Nation's transmission grid, the tariff that is "effective and on file on the date that the interconnection agreement is executed or filed unexecuted" dictates the agreement's terms and conditions. *Midwest Indep. Transmission Sys. Operator, Inc.* ("*MISO III*"), 138 FERC ¶ 61,199 at P 42 n.56 (2012).

In the proceedings below, as a condition to allowing West Deptford to interconnect its electric generation facilities to the transmission grid, PJM sought to require West Deptford to pay more than $10 million for the costs of a previously constructed upgrade made to the transmission network in 2003. It is undisputed, however, that the terms of the PJM tariff in effect and on file with the Commission forbid allocating those costs to West Deptford. Nonetheless, the Commission's orders have required West Deptford to shoulder all of the costs of the previously

4

constructed upgrade by allowing PJM to apply the terms of a superseded tariff that has not been in effect since 2008.    According to the Commission, applying the superseded tariff is appropriate because that tariff was on file in 2006, when West Deptford first initiated the interconnection process by submitting a non-binding request to negotiate an interconnection agreement with PJM.    In the Commission's view, although the existing tariff includes no "grandfather" provision establishing that the superseded tariff would apply to future interconnection agreements, the superseded tariff applies to West Deptford essentially because PJM said so, in two unlikely places.    First, in a non-binding pleading submitted to the Commission, in response to a question concerning a different tariff provision, PJM made statements suggesting that it did not wish to apply the new tariff to pending interconnection requests.    Second, in studies conducted between 2006 and 2011, PJM assumed that West Deptford would be responsible for paying the costs of the previously constructed upgrade.

As described in more detail below, the Commission's orders violate the Federal Power Act and are contrary to law.    If left uncorrected, they would establish a dangerous precedent that would eviscerate the filed

rate doctrine by allowing utilities (and the Commission) to deviate from filed tariffs and engage in favoritism and undue discrimination. The Commission's orders are also invalid because they do not adequately explain their departure from precedent or respond meaningfully to serious objections raised by West Deptford in the proceedings below.

## A.    Regulatory Framework

The Federal Power Act prohibits utilities from imposing any rate or charge not on file with the Commission. *See generally NRG Power Mktg., LLC v. Maine PUC*, 130 S. Ct. 693, 698 (2010) (noting the statute's file-all-rates requirement); *Montana-Dakota Utils. Co. v. Nw. Pub. Serv. Co.*, 341 U.S. 246, 251-52 (1951). Section 205 of the Act thus mandates that every public utility "shall file with the Commission" and "keep open in convenient form and place for public inspection schedules showing all rates and charges for any transmission or sale subject to the jurisdiction of the Commission." 16 U.S.C. § 824d(c); *see also* 18 C.F.R. § 35.1(a).

That basic filing requirement helps to prevent undue discrimination, promotes transparency, and enables the Commission to fulfill its statutory obligations. Those obligations include ensuring that rates charged "in connection with the transmission or sale of electric

energy," as well as "all rules and regulations affecting or pertaining to such rates or charges," are just and reasonable and not unduly discriminatory or preferential. 16 U.S.C. § 824d(a). In addition, the statute assigns the Commission responsibility for overseeing public utilities that "own[] or operate[] facilities subject to" the Commission's jurisdiction, *id.* § 824(e), and for ensuring that they do not "make or grant any undue preference or advantage to any person." *Id.* § 824d(b). The statute declares unlawful any rate or practice that is "unjust, unreasonable, unduly discriminatory or preferential." *Id.* § 824e(a).

As this Court is no doubt aware, over the past two decades the Commission has tried to promote competition and eliminate unduly discriminatory barriers to entry in the Nation's wholesale energy markets. *See, e.g.*, *Transmission Access Policy Study Grp. v. FERC*, 225 F.3d 667 (D.C. Cir. 2000), *aff'd sub nom. New York v. FERC*, 535 U.S. 1 (2002). In brief, beginning in the late 1990s, the Commission undertook a major initiative — known as Order No. 888 — "to remove impediments to competition in the wholesale bulk power marketplace and to bring more efficient, lower cost power to the nation's electricity customers." *Promoting Wholesale Competition Through Open Access*

7

*Non-discriminatory Transmission Servs. by Pub. Utils.,* Order No. 888, 61 Fed. Reg. 21,540, 21,451 (May 10, 1996). The Commission ordered transmission owners to unbundle their generation and transmission services, and to provide transmission service to all eligible customers on a non-discriminatory basis. It required owners of transmission facilities to set "separate rates" for their "wholesale generation, transmission, and ancillary services, and to take transmission of [their] own wholesale sales and purchases under a single general tariff applicable equally to [themselves] and to others." *New York*, 535 U.S. at 11. And it encouraged utilities to transfer control of their transmission facilities to independent system operators and regional transmission organizations. *See Regional Transmission Orgs.*, Order No. 2000, 65 Fed. Reg. 810 (Jan. 6, 2000).

In 2003, the Commission recognized that requests by competitive electric generators to interconnect to the transmission grid were often bogged down in "complex, time consuming technical disputes about interconnection feasibility, cost, and cost responsibility," which "undermine[d] the ability of generators to compete in the market and provide[d] an unfair advantage to utilities that own both transmission

and generation facilities." *Standardization of Generator Interconnection Agreements and Procedures*, Order No. 2003, FERC Stats. & Regs. ¶ 31,146 at P 11 (2003); *id.* (observing that "[i]nterconnection plays a crucial role in bringing much-needed generation into the market" and that "unencumbered entry into the market is necessary for competitive markets"). To address that problem, the Commission promulgated Order No. 2003. The final rule was designed to end the Commission's case-by-case approach to interconnection disputes by requiring all public utilities "that own, control, or operate facilities used for transmitting electric energy in interstate commerce" to incorporate into their tariffs standard interconnection procedures and a *pro forma* interconnection agreement. *Id.* at P 2. The Commission concluded that imposing a "standard set of procedures" would "minimize opportunities for undue discrimination and expedite the development of new generation, while protecting reliability and ensuring that rates are just and reasonable." *Id.* at P 11.

## B.    PJM's Interconnection Procedures

PJM is the regional transmission organization responsible for operating the transmission grid and bulk power markets in thirteen eastern states and the District of Columbia. In accordance with Order

No. 2003, PJM's open access transmission tariff sets forth the terms and conditions governing new interconnections to the transmission grid. *See* PJM Open Access Transmission Tariff ("PJM Tariff") (JA __); *see also FPL Energy Marcus Hook, L.P. v. FERC*, 430 F.3d 441, 443 (D.C. Cir. 2005). Under the tariff, a generator seeking to interconnect initiates the interconnection process by submitting an interconnection request describing its generation facility, together with an initial deposit. PJM Tariff § 36.1.01 (JA __). Each request is placed "into a first-come, first-served queue," *FPL Energy*, 430 F.3d at 443, where priority is "based on the date and time" of the request. PJM Tariff § 201 (JA __).

Entering the queue does not fix the terms of interconnection or obligate the generator to take interconnection service. Instead, entering the queue starts an administrative process that holds the generator's place in line while PJM conducts a series of studies to analyze the proposed project's feasibility, its impact on the overall transmission system, and the need for potential upgrades to the network. *See*, *e.g.*, PJM Tariff §§ 36.2, 205.2, 207 (JA __, __, __); *Dominion Res. Servs. Inc. v. PJM Interconnection, L.L.C.*, 123 FERC ¶ 61,025 at P 52 (2008) (studies are not binding). At any time during the process and before signing an

10

interconnection agreement, a generator can leave the queue by terminating or withdrawing its interconnection request. *FPL Energy*, 430 F.3d at 443. Alternatively, a generator may lose its queue position if it makes material modifications to its proposed project, misses any of the milestones established under the tariff, or fails to pay required deposits. *See, e.g.*, PJM Tariff §§ 36.2A, 206.2, 206.3, 206.4.1.2 (JA __, __, __, __).

Once PJM has completed the required studies, it will tender an interconnection service agreement to the generator that should conform with the tariff and the *pro forma* agreement on file with the Commission. That agreement will specify the terms and conditions of interconnection, including the costs and charges that must be paid. At that juncture, the generator must make a final decision whether to interconnect its facilities and contract with PJM for interconnection service. If the generator decides to take interconnection service, it may either execute the agreement within a defined period or, if the generator disagrees with any of the agreement's terms, it may request that the unexecuted agreement be filed with the Commission and ask the Commission to resolve the dispute. *Id.* § 212.4(a) (JA __).

Under PJM's tariff, when a generator interconnects to the transmission system, it may be required to pay for upgrades to the transmission system — known as "network upgrades" — that are needed to allow the transmission grid to handle the increase in power added to the system. Network upgrades benefit more than just the generator whose interconnection request requires them; existing users of the system, as well as later interconnecting generators, benefit from the additional stability and reliability that results when upgrades are made to the system. *See Entergy Servs., Inc. v. FERC*, 319 F.3d 536, 539 (D.C. Cir. 2003).

Because disputes often arise over the costs of network upgrades, PJM's tariff establishes a set of rules governing who must bear those costs and how they can be recovered. Section 217 provides that an interconnecting generator is responsible for the initial cost of any upgrade that is "necessary to accommodate" its request and "that would not have been incurred . . . but for" its interconnection request. PJM Tariff § 217.3(a) (JA __). Responsibility for bearing those costs is then allocated among parties who are determined, consistent with the tariff's requirements, to have contributed to the need for the upgrade. When a

12

network upgrade is projected to cost more than $5 million, the tariff provides that "the first Interconnection Request in the queue contributing to the need for the required [upgrade] will always receive a cost allocation," and that costs "shall be further allocated to subsequent projects in the [queue], pursuant to queue order, and pursuant to the Interconnection Request's megawatt contribution to the need" for the upgrade. *Id.* § 217.3a(i) (JA __).

In certain circumstances, a generator may also be responsible for the costs of previously constructed network upgrades. Because that obligation cannot be open-ended, however, PJM's tariff has always contained a temporal cut-off — a period of time after which new interconnecting generators can no longer be required to contribute to the costs of earlier network upgrades. The current version of PJM's tariff provides that an interconnecting generator is responsible for the cost of previously constructed facilities costing at least $5 million "for a period of time not to exceed five years from the execution date of the Interconnection Service Agreement for the project that initially necessitated the requirement for the Local Upgrade or Network Upgrade." *Id.* § 219(a) (JA __). (As discussed in more detail below, an

13

earlier, superseded version of PJM's tariff imposed a different limitations period and a different total cost requirement.  *See PJM Interconnection, L.L.C.*, Docket No. EL08-36-001, Compliance Filing, PJM Transmittal Ltr. Attachment, PJM Superseded Tariff Redline, § 37.7(c) ("PJM Superseded Tariff") (JA __).)

Finally, because network upgrades "benefit all transmission customers," the Commission has determined that a generator that pays the cost of financing network upgrades should be entitled to a credit for their full cost, to be applied against the customer's payments for transmission services.  *See* Order No. 2003, FERC Stats. & Regs. ¶ 31,146 at PP 21-22.  As the Commission has explained, crediting a generator for the network upgrades it funds is consistent with the Commission's historical prohibition against "and" pricing — *i.e.*, double charging — because once the system is upgraded, the costs of the upgrade will be embedded in the transmission service rates the generator is required to pay.  *See id.* at P 694 & nn.111-12.  By giving the generator a credit for the cost of constructing network upgrades, the Commission's rule prevents the generator from being "charged twice for the use of the Transmission System."  *Id.* at P 694; *see also Entergy*, 319

F.3d at 542.  Accordingly, to address the problem of double charging, the PJM tariff states that a generator that pays for "constructing or completing" a network upgrade is entitled to receive financial compensation in the form of auction revenue rights, which provide the generator with the right to receive revenue from the sale of transmission rights associated with the new or upgraded facilities.  PJM Tariff § 231 (JA __).

## C.    Factual Background

This case concerns a dispute over the proper allocation of costs for a previously constructed network upgrade on the PJM-operated transmission grid called Network Upgrade 28.  *See* 139 FERC ¶ 61,184 at PP 1-2 (JA __).  Network Upgrade 28 consists of a 230-kilovolt circuit, along with certain related facilities, placed on a portion of the transmission grid known as the Mickleton-Monroe transmission line.  *Id.* at P 2 (JA __).

***The Initial Assignment Of Costs For Network Upgrade 28.*** More than a decade ago, PJM initially determined that Network Upgrade 28 would be necessary to accommodate interconnection requests submitted by two interconnecting generators — specifically,

15

requests by Liberty Electric Power, LLC ("Liberty Electric") for an approximately 540 megawatt electric generation facility located near Philadelphia, Pennsylvania, and by FPL Energy Marcus Hook ("Marcus Hook") for an approximately 750 megawatt facility located in Marcus Hook, Pennsylvania. *Id.* at P 3 (JA __). When they executed their interconnection agreements, Liberty Electric and Marcus Hook both agreed to be assigned responsibility for the cost of Network Upgrade 28 under the terms of PJM's tariff. Liberty Electric, which took responsibility for approximately $1 million in costs, executed an agreement on May 14, 2001 (which superseded two previously executed agreements), and commenced commercial operations in May 2002. *Id.* (JA __); *FPL Energy*, 430 F.3d at 444. Marcus Hook, which took responsibility for approximately $10 million in costs, executed an interconnection service agreement on January 20, 2002, and commenced commercial operations in 2004. *FPL Energy*, 430 F.3d at 444.

In December 2002, several months after Liberty Electric and Marcus Hook executed their respective interconnection agreements, a higher-queued project being developed by Mantua Creek Generating Company, LLC, prematurely withdrew from the queue. In the wake of

that withdrawal, PJM determined that Network Upgrade 28 was no longer necessary to accommodate Liberty Electric's and Marcus Hook's interconnection requests. *See generally id.* at 444. Nonetheless, because the construction of Network Upgrade 28 was nearly complete, PJM decided that construction should continue. *See id.* Network Upgrade 28 entered service in June 2003. *FPL Energy Marcus Hook, L.P. v. PJM Interconnection, L.L.C.* ("*Marcus Hook I*"), 107 FERC ¶ 61,069 at P 10, *reh'g denied*, 108 FERC ¶ 61,171 (2004) ("*Marcus Hook II*").

**Marcus Hook's Complaint Proceeding**. In 2004, Marcus Hook filed a complaint against PJM, asserting that it should not be required to pay for Network Upgrade 28 because PJM had later determined — *i.e.*, after Marcus Hook executed its interconnection agreement — that the upgrade was unnecessary to accommodate its interconnection request. *See Marcus Hook I,* 107 FERC ¶ 61,069. In that four-year long dispute, the Commission took the position that Marcus Hook was responsible for the costs of Network Upgrade 28 because its interconnection agreement — executed before Mantua's withdrawal — included that requirement.

After the Commission rejected Marcus Hook's complaint and denied rehearing, Marcus Hook filed a petition for review. This Court

17

largely affirmed, but remanded for the Commission to explain its finding that there were no system benefits resulting from the upgrade that should be subtracted from Marcus Hook's cost responsibility. *See FPL Energy*, 430 F.3d 441. On remand, the Commission denied Marcus Hook's complaint based on its "review of the PJM tariff in effect at the time the Interconnection Service Agreement was executed." *FPL Energy Marcus Hook, L.P. v. PJM Interconnection, L.L.C.* ("*Marcus Hook III*"), 118 FERC ¶ 61,169 at P 10 (2007), *reh'g denied*, 123 FERC ¶ 61,289 (2008) ("*Marcus Hook IV*"). The Commission held that, because Marcus Hook had failed to object when it signed the interconnection agreement, its complaint was untimely under the terms of the applicable tariff. *Id.* at PP 15-16; *see also* 123 FERC ¶ 61,289 at P 29 (2008)("any such challenge must precede execution" of the interconnection agreement). The Commission further held that Marcus Hook would receive adequate compensation for the cost of constructing the upgrade in the form of incremental auction revenue rights. *Marcus Hook III*, 118 FERC ¶ 61,169 at PP 32-34.

**West Deptford's Interconnection Request**. On July 31, 2006, in the midst of the Marcus Hook proceedings, West Deptford submitted a

request to PJM seeking to interconnect an 800 megawatt electric generation facility in West Deptford Township, New Jersey. PJM placed the request in the queue, designating it as number Q90. *See* 139 FERC ¶ 61,184 at PP 4, 12, 63 (JA __). On the same day, PJM began conducting the first of a series of cost and feasibility studies. *See* R.4 (West Deptford Protest), Attachments 1-5 (JA __-__).

***PJM's Current Tariff***. In May 2008, while PJM continued to consider West Deptford's interconnection request, PJM filed a revision to its tariff setting forth updated terms and conditions for interconnecting to the transmission grid. *See* 139 FERC ¶ 61,184 at P 10 (JA __). PJM filed that revision as part of the contested settlement of a complaint by Dominion Resources Services, Inc. ("Dominion") alleging that PJM had improperly processed interconnection requests. *Id.* at P 11 (JA __); *see also Dominion*, 123 FERC ¶ 61,025 at P 1-3. The Commission approved the contested settlement on April 10, 2008, and at PJM's request the new tariff became effective August 1, 2008. *Id.*.

Among other things, PJM's new tariff changed the requirements for when an interconnecting generator must pay for the costs of previously constructed network upgrades. The earlier, superseded

19

version had allowed PJM to seek reimbursement if the upgrade cost $10 million or more and if the upgrade was "placed in service no more than five years prior to the affected Interconnection Customer's Interconnection Queue closing date."   136 FERC ¶ 61,195 at P 24 (quoting PJM Superseded Tariff § 37.7) (JA __).   In contrast, the new tariff, in section 219, permitted PJM to seek reimbursement if the previously constructed upgrade cost $5 million or more and if no more than five years had elapsed "from the execution date of the Interconnection Service Agreement" for the project that had initially necessitated the network upgrade.   PJM Tariff § 219(a) (JA __). According to PJM, the change was designed to "provide stakeholders with one defined timeframe (five years) for when they may expect cost allocations to be adjusted . . . ." *PJM Interconnection, L.L.C.*, Docket No. EL08-36-001, Compliance Filing, PJM Transmittal Ltr. at 8 (May 30, 2008) ("PJM Transmittal Ltr.") (JA __).  PJM justified the revised tariff on grounds that it would "improve the predictability of the cost allocation process" and "allow[] stakeholders a better opportunity to consider pending costs." *Id.*

Significantly, when PJM proposed the changes to its tariff, it did not include any "grandfathering" provision or other language in the new tariff seeking permission to apply the superseded version of section 219 to generators in the queue that had submitted interconnection requests before August 1, 2008. Instead, the tariff by its terms applies to any and all interconnection service agreements, beginning August 1, 2008, and does not distinguish between interested generators. That is consistent with PJM's position that neither the submission of an interconnection request nor the execution of any study has the effect of "lock[ing] down" tariff provisions and shielding them from future changes. *See PJM Interconnection, L.L.C.*, Docket No. EL08-36-000, PJM Reply Comments at 4 (Mar. 24, 2008).

*West Deptford's Interconnection Agreement*. Almost three years later, on April 21, 2011, PJM tendered to West Deptford a draft interconnection service agreement. R.4 at 9 (West Deptford Protest) (JA __). PJM concluded that West Deptford's interconnection request contributed to the need for Network Upgrade 28, and proposed to hold West Deptford responsible for 100% of its cost by requiring West Deptford to pay $10,761,078. *See* 139 FERC ¶ 61,184 at P 6 (JA __).

21

Because Liberty Electric's project had initially triggered the need for Network Upgrade 28 — and Liberty Electric had executed its interconnection agreement nearly ten years earlier in May 2001 — that cost allocation is barred under section 219 of PJM's currently effective tariff. PJM Tariff § 219(a) ("Cost responsibility … may be assigned … for a period of time not to exceed five years from the execution date of the Interconnection Service Agreement for the project that initially necessitated" the network upgrade). Nonetheless, PJM contended that West Deptford should be required to comply with the superseded version of its tariff, under which a customer could be assigned cost responsibility for an upgrade "placed in service no more than five years prior to the affected Interconnection Customer's Interconnection Queue Closing Date." 136 FERC ¶ 61,195 at P 24 (quoting PJM Superseded Tariff § 37.7(c)) (JA __).

West Deptford objected to the interconnection agreement's departure from the terms and conditions of the currently applicable tariff, and it requested that PJM file the draft agreement unexecuted with the Commission. R.4 at 9 (West Deptford Protest) (JA__).

### D.    Proceedings Below

On July 18, 2011, PJM filed the unexecuted interconnection service agreement with the Commission.  West Deptford protested that filing on August 8, 2011.  As relevant here, West Deptford explained that the filed rate doctrine and Commission precedent required PJM to apply the current version of section 219 because it is the tariff "that is effective and on file on the date that" the interconnection service agreement was filed unexecuted.  *See id.* at 16 (citing *Midwest Indep. Transmission Sys. Operator, Inc.* ("*MISO I*"), 129 FERC ¶ 61,060 P 62 (2009)) (JA __).  West Deptford also observed that Marcus Hook, and possibly Liberty Electric, had been entitled to incremental auction revenue rights since 2004, in partial compensation for the costs they incurred when they agreed to fund Network Upgrade 28.  *See id.* at 26 (JA __).  For that reason, even if West Deptford were required to reimburse Marcus Hook and Liberty Electric for Network Upgrade 28, the reimbursement award should be offset against the revenues they derived from those auction rights, to avoid (among other things) unduly discriminatory double compensation. *See id.* at 25-27 (JA __).

23

*The Commission's Initial Order*.  On September 16, 2011, the Commission accepted PJM's unexecuted service agreement without modification.   136 FERC ¶ 61,195 (JA __).   The Commission acknowledged — as PJM had conceded, *see* R.6 at 5 (PJM Answer) (JA __) — that under section 219 of PJM's filed tariff, "West Deptford would be exempt from paying for Network Upgrade 28, since more than five years have passed from the execution date of Marcus Hook's" interconnection agreement.   136 FERC ¶ 61,195 at P 34 (JA __). Nevertheless, the Commission concluded that the superseded version of section 219 should apply because "at the time when West Deptford entered the . . . queue, [the superseded] provision was the one that established its financial responsibility."  *Id.* at P 35 (JA __).

The Commission also asserted that PJM had "confirmed that the tariff change [to section 219] would operate prospectively" when it filed a "transmittal letter in Docket No. EL08-36-000," the proceeding in which PJM sought to amend its tariff.  *Id.* at P 37 (JA __).  Although PJM's transmittal letter merely stated that it proposed an effective date of August 1, 2008, "to allow the proposed changes to become effective with the date of the next open queue," the Commission interpreted that

24

statement to mean that PJM had "explained that [the] tariff changes would apply only to the queue starting with the 'U2-Queue.'" PJM Transmittal Ltr. at 2 (JA __); 136 FERC ¶ 61,195 at P 37 (JA __). Accordingly, because the West Deptford project "was in an earlier queue . . . to which the proposed changes would not be applied," it would not be subject to the terms and conditions of the filed tariff. 136 FERC ¶ 61,195 at P 31 (JA __).

Finally, in one conclusory sentence, the Commission rejected West Deptford's argument that the filed rate doctrine requires PJM to apply the currently effective version of its tariff. *Id.* at P 38 (JA __). According to the Commission, "West Deptford was on notice of the costs to which it potentially would be liable." *Id.* at P 38 & n.30 (citing *Natural Gas Clearinghouse v. FERC*, 965 F.2d 1066, 1075 (D.C. Cir. 1992)).

***The Commission's Rehearing Order***. On June 7, 2012, the Commission denied rehearing. 139 FERC ¶ 61,184 (JA __). The Commission adhered to the view that the filed rate doctrine did not require it to apply section 219 of PJM's tariff to West Deptford's interconnection service agreement. *Id.* at PP 26-46 (JA __). The Commission said that PJM had "put all parties on notice" of its intent to

continue applying the previous version of its tariff to interconnection requests pending in the queue through "statements" made in an "answer" and through the cost studies it conducted for the West Deptford project. *Id.* at PP 28-29 (JA ___).

In its petition for rehearing, West Deptford pointed out that the Commission's interpretation of the filed rate doctrine is inconsistent with precedent in which the Commission has applied the cost-allocation policy reflected in the tariff on file on the date the parties executed an interconnection service agreement. The Commission rejected that argument, asserting that its earlier cases did not "establish a single policy to address all the myriad issues that may arise from a change to cost allocation in the interconnection process," and that the Commission must evaluate, "[i]n each case," whether a particular utility may depart from the filed rate when allocating costs. *Id.* at P 38 (JA ___).

## SUMMARY OF ARGUMENT

1.     The Federal Power Act and the filed rate doctrine prohibit any regulated entity from charging rates for services other than the rates on file with the Commission.  The Commission's orders violate that bedrock requirement by requiring West Deptford to pay for a network upgrade constructed nine years ago, even though allocating that cost to West Deptford is concededly prohibited under the current tariff on file with the Commission.  Instead, the Commission is unlawfully attempting to hold West Deptford responsible for the network upgrade based on a superseded version of the tariff that has not been in effect since 2008.

The Commission's orders seek to justify requiring West Deptford to comply with the terms of the superseded tariff by invoking the "notice" exception to the filed rate doctrine.  But that exception is inapplicable:  It applies only when parties are on notice that a rate might change because the tariff itself provides notice or because the rate is challenged in litigation.  The Commission has cited no authority for its novel view that a utility, like PJM, may avoid the filed rate merely because it has unilaterally announced its intention to do so.  Nor has the Commission demonstrated that West Deptford received appropriate notice that,

unlike other generators seeking to interconnect, it would be subject to the terms of a superseded tariff. PJM's suggestion in a non-binding pleading that it did not intend to apply the publicly filed tariff to generators in its queue is precisely the type of deviation from the filed rate that the Federal Power Act prohibits. PJM is bound by the tariff it chose to file, which contains the only provisions that were subject to review by the Commission and ultimately this Court.

2. The Commission's orders also violate the requirements of reasoned decision-making. Long-standing Commission precedent holds that the tariff that applies when a generator takes interconnection service is the one that is "effective and on file on the date that the interconnection agreement is executed or filed unexecuted." *MISO III*, 138 FERC ¶ 61,199 at P 42 n.56. Yet in this case, the Commission chose to apply a tariff in effect at a *different* time: the one on file when West Deptford first entered the PJM queue by submitting its initial, non-binding request for interconnection service. The Commission provided no reasoned basis for departing from precedent. If anything, the explanation provided in the Commission's orders only confirms that the Commission's approach is arbitrary and capricious: It announces an

28

expansive (and unprecedented) interpretation of a utility's authority to deviate from the filed rate. In addition, the Commission has not responded meaningfully to objections raised by West Deptford, including the objection that requiring it to retroactively assume full responsibility for all of the costs of Network Upgrade 28 will provide a discriminatory windfall to West Deptford's competitors, who have already received monetary reimbursement for part of the costs of that upgrade, which they initially paid to construct.

## STANDING

West Deptford's standing is self-evident. The Commission's orders cause injury in fact because, among other things, they unlawfully require West Deptford to pay approximately $10 million for a previously constructed transmission network upgrade. The Court can redress that concrete injury by vacating the Commission's orders. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

## STANDARD OF REVIEW

The Commission's interpretation of the Federal Power Act is subject to the familiar analysis in *Chevron U.S.A. Inc. v. Natural Resources Defense Council Inc.*, 467 U.S. 837, 843 (1984). *See Detroit Edison Co. v. FERC*, 334 F.3d 48, 53 (D.C. Cir. 2003). The Court should

defer to an agency's statutory interpretation "only when the devices of judicial construction have been tried and found to yield no clear sense of congressional intent." *General Dynamics Land Sys. Inc. v. Cline*, 540 U.S. 581, 600 (2004). Where, as here, a statute has been interpreted to unambiguously constrain an agency's authority, there is no room for agency discretion. *National Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982-83 (2005); *see also United States v. Home Concrete & Supply, LLC*, 132 S. Ct. 1836, 1843-43 (2012); *Lechmere, Inc. v. NLRB*, 502 U.S. 527, 536 (1992).

Under the Administrative Procedure Act, the Commission's orders should be set aside if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency violates those requirements if it departs from precedent without reasoned explanation, *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009); fails to articulate a "rational connection between the facts found and the choice made," *Florida Gas Transmission Co. v. FERC*, 604 F.3d 636, 639 (D.C. Cir. 2010); or fails "to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## ARGUMENT

### I. The Commission's Orders Violate The Filed Rate Doctrine And The Related Statutory Requirements.

The Commission's orders violate the Federal Power Act by permitting PJM to charge West Deptford a rate for interconnection service different from the rate on file with the Commission. Although the Commission contends that West Deptford should have known it would be subject to a different rate, the Commission's approach misapplies the filed rate doctrine's "notice" exception — and indeed transforms it into an exception that threatens to swallow the rule. In any case, the notice that West Deptford purportedly received was legally inadequate.

#### A. The Statute Prohibits Regulated Entities From Imposing Any Charge Not Reflected In The Filed Rate.

Section 205 of the Federal Power Act requires "every public utility" to "file with the Commission . . . *all rates* and charges for any transmission or sale . . . , and the classifications, practices, and regulations affecting such rates and charges, together with all contracts which in any manner affect or relate to such rates, charges, classifications, and services."  16 U.S.C. § 824d(c) (emphasis added). Under the statute, after a tariff is filed with the Commission, a public

31

utility may modify it only by filing "new schedules stating plainly the change or changes to be made in the schedule or schedules then in force and the time when the change or changes will go into effect." *Id.* § 824d(d). It is black letter law that a utility may not "charge rates for its services other than those properly filed with the appropriate federal regulatory authority." *Arkansas La. Gas Co. v. Hall*, 453 U.S. 571, 577 (1981); *Towns of Concord, Norwood, and Wellesley, Mass. v. FERC*, 955 F.2d 67, 70-72 (D.C. Cir. 1992).

The rule derived from these statutory requirements is known as the filed rate doctrine. *See NSTAR Elec. & Gas Corp. v. FERC*, 481 F.3d 794, 800 (D.C. Cir. 2007); *see also Borough of Ellwood City v. FERC*, 583 F.2d 642, 648 (3d Cir. 1978) (the rule is "not so much a judicially created 'doctrine' as an application of explicit statutory language"). The doctrine provides that a public utility may not charge a price for a service that differs from the current rate on file with the agency at the time service is provided. *See, e.g.*, *Louisville & Nashville R.R. Co. v. Maxwell*, 237 U.S. 94, 97 (1915) (a deviation from the filed rate is "not permitted upon any pretext"). That is because "the rate filed with the Commission supersedes any price that private purchasers may have contractually

32

agreed to pay." *Burlington Res. Inc. v. FERC*, 513 F.3d 242, 248 (D.C. Cir. 2008).  Moreover, the filed rate doctrine is not restricted to "rates" — it applies to any provision of a filed tariff.  *American Tel. & Tel. Co. v. Cent. Office Tel., Inc.*, 524 U.S. 214, 223-24 (1998).  The filed provisions are "the exclusive source of the terms and conditions by which" a regulated entity provides services "covered by the tariff." *California ex rel. Lockyer v. Dynegy, Inc.*, 375 F.3d 831, 853 (9th Cir. 2004); *see also id.* (the terms of the filed tariff "conclusively and exclusively enumerate the rights" of the contracting parties).

As this Court has recognized, the filed rate doctrine "serv[es] the dual purposes of ensuring rate predictability for purchasers of regulated electricity and promoting equity among customers by preventing discriminatory pricing." *NSTAR Elec.*, 481 F.3d at 800 (internal quotation marks and citation omitted).  It also imposes important constraints on the Commission's discretion and its exercise of remedial authority.  *Exxon Mobil Corp. v. FERC*, 571 F.3d 1208, 1211 (D.C. Cir. 2009).  By requiring the Commission to exercise regulatory authority through the review and approval of published, generally applicable tariff provisions, and by prohibiting departures from the publicly filed tariff,

33

the doctrine serves to "destroy favoritism" and to protect against other forms of undue discrimination.  *New York, New Haven & Hartford R.R. Co. v. ICC*, 200 U.S. 361, 391 (1906).

A straightforward application of the filed rate doctrine entitles West Deptford to the cost-allocation provisions of the tariff on file and in effect on the date it commits to taking interconnection service by executing an interconnection service agreement (or filing the agreement unexecuted).  Section 219 of the currently effective tariff limits the obligation to pay for prior network upgrades to "a period of time not to exceed five years from the execution date of the Interconnection Service Agreement for the project that initially necessitated the requirement for the Local Upgrade or Network Upgrade."  PJM Tariff § 219 (JA __). Because Network Upgrade 28 was necessitated by Liberty Electric's interconnection request, section 219's limitations period expired on August 15, 2006 — five years after Liberty Electric executed its service agreement on May 14, 2001.  Accordingly, West Deptford should not be charged for the cost of Network Upgrade 28.

The Commission does not dispute that under section 219 of the tariff on file and in effect, West Deptford cannot be charged for Network

Upgrade 28.  It instead asserts that the terms of the superseded tariff apply because "the relevant date for determining cost responsibility is when the new interconnection project enters the queue, not when it signs its final interconnection agreement."  139 FERC ¶ 61,184 at P 30 (JA __). That is wrong.  As the Commission has acknowledged, "the appropriate inquiry" under the filed rate doctrine "seeks to identify the purchase decisions to which the costs are attached."  *Id.* at P 27 (JA __) (quoting *Associated Gas Distribs. v. FERC*, 893 F.2d 349, 355 (D.C. Cir. 1989)). Here, the relevant purchase decision is West Deptford's decision to enter into a final agreement for interconnection service, at the price and under the terms laid out in the contract, which is subject to Commission review for compliance with the tariff and the statute.  As the Commission has previously held, when an electric generator interconnects its facilities to the Nation's transmission grid, the tariff that applies is the tariff that is "effective and on file on the date that the interconnection agreement is executed or filed unexecuted."  *MISO III*, 138 FERC ¶ 61,199 at P 42 n.56; *MISO I*, 129 FERC ¶ 61,060 at P 62.

In contrast, merely entering the queue does not oblige a generator to take interconnection service and interconnect its facilities to the

transmission grid. Instead, once the generator has entered the queue, a series of off-ramps present themselves on the road to a final agreement. The generator is free to exit at any time. As explained above, after a generator first enters PJM's queue, PJM performs a series of cost and feasibility studies, and the generator in turn is responsible for a series of deposits and other performance milestones *en route* to a final agreement — an agreement that will occur years later. It is only the generator's decision to execute a final interconnection agreement, with final terms, that legally obligates PJM to provide interconnection services — services for which PJM may not "charge rates . . . other than those properly filed" with the Commission. *Hall*, 453 U.S. at 577.

## B.   The Limited "Notice" Exception To The Filed Rate Doctrine Does Not Apply.

Against the filed rate doctrine's clear command, the Commission's orders purport to invoke a "notice" exception to that rule. 139 FERC ¶ 61,184 at PP 27-34 (JA __). There is indeed a limited notice exception, but it does not apply here.

As this Court has observed, there are "only two circumstances in which a rate adjustment may take effect prior to a section 205 filing" (*i.e.*, contrary to the filed rate): "[W]hen parties have notice *that a rate is*

*tentative and may be later adjusted with retroactive effect*, or when they have agreed to make a rate effective retroactively." *Consolidated Edison Co. of N.Y., Inc. v. FERC*, 347 F.3d 964, 969 (D.C. 2003) (emphasis added). *Natural Gas Clearinghouse*, 965 F.2d 1066, on which the Commission's orders heavily rely, is an example of the italicized exception.

*Natural Gas* held that a new rate could be imposed on past services rendered because the customer had notice that the rate could change as the result of pending litigation. *See id.* at 1075. As this Court has recognized, the general rule against retroactivity does not apply when there is "adequate notice that resolution of some specific issue may cause a later adjustment to the rate being collected at the time of service." *OXY USA Inc. v. FERC*, 64 F.3d 679, 699 (D.C. Cir. 1995) (citing *Natural Gas*, 965 F.2d at 1075). That limited exception to the filed rate doctrine is relevant typically in circumstances where the Commission seeks to remedy errors after it is reversed on appeal or in circumstances where the tariff filing itself provides notice that the rate may change. *See City of Anaheim v. FERC*, 558 F.3d 521, 525 (D.C. Cir. 2009) (cases not "on point" where the Commission "was not responding to a court decision");

*see also NSTAR Elec.*, 481 F.3d at 801 (mitigation agreements could go into effect because customers were on notice in the filed tariff that default prices were "provisional only and subject to later revision"); *Canadian Ass'n of Petroleum Producers v. FERC*, 254 F.3d 289, 299-300 (D.C. Cir. 2001) ("initial rate filing — combined with the ongoing litigation and absence of a final, non-appealable order — provided the necessary notice" that shippers might have to "pay rates up to the level originally filed").

The notice exception is inapplicable here. This case does not involve an attempt by the Commission to correct an error after being reversed on appeal. Nor is there any argument that PJM's tariff itself provided notice that West Deptford could be subject to a superseded rate. More fundamentally, this Court's "notice" cases all address circumstances where, upon providing appropriate notice, a regulated entity seeks to charge a *new* rate for *past* services rendered. That is the mirror opposite of this case: PJM is attempting to charge a *past* rate for a *new* service. West Deptford is aware of no case that permits a public utility to escape the filed rate doctrine in that manner. Indeed, if the Commission's approach is left uncorrected, the notice exception

threatens to swallow the general rule and displace the statutory requirement that all rates be filed with the Commission

To illustrate:  A public utility charges $100 for a service in 2006.  It then changes the rate to $150 in 2011.  Under the filed rate doctrine, the utility must charge the $100 rate for services provided before the new $150 rate is on file and in effect.  Under the notice exception, if the utility gave appropriate notice in 2006 that the $100 rate was provisional and subject to increase (either by providing notice in the tariff itself or because the $100 rate was challenged in litigation), it could then recover the additional $50 in 2011.  This case flips that situation on its head: PJM has unilaterally announced that it will charge West Deptford an older, higher *2006* rate for services rendered in *2011*, after the older rate has been superseded and a new one is on file.  No amount of "notice" in 2006 could change that the old rate simply *no longer applies* once the 2011 rate is on file with the Commission.

The Commission's orders cite no case holding that a utility can charge a superseded rate as long as it announces when changing the rate that the change will not apply to all customers equally going forward. Instead, the Commission stated that the filed rate doctrine "is not

39

violated where a utility propose[s] a tariff change to be effective prospectively for those customers that seek service after that date." 139 FERC ¶ 61,184 at P 27. That is certainly true, but it does not describe this case: Here, the utility is proposing that a tariff change *not* be effective prospectively for customers seeking service after its effective date — or at least for some of those customers, to be identified by PJM.

Allowing a utility to do this would undermine the filed rate doctrine's purpose to "prevent[] discriminatory pricing." *NSTAR Elec.*, 481 F.3d at 800. Indeed, the Commission's interpretation improperly permits PJM to engage in whatever discrimination it likes, so long as it announces (unilaterally, and outside the challengeable tariff) which parties it wishes to apply the new rate to and which it does not.

### C.    The "Notice" Provided Was Not Legally Adequate.

Even if PJM could avoid the filed rate doctrine by providing "notice" that it may continue to charge a superseded rate in the future, the forms of notice it provided were not acceptable or legally adequate.

In its order on rehearing, the Commission explained that PJM had provided notice to West Deptford through a statement in a pleading in a separate proceeding — PJM's answer in the *Dominion* case. 139 FERC

¶ 61,184 at PP 11-12, 28 (JA __); *see* PJM Transmittal Ltr. at 17 (JA __); *PJM Interconnection, L.L.C.*, Docket No. EL08-36-000, Answer of PJM Interconnection, L.L.C. to Request for Clarification of American Municipal Power – Ohio, Inc. at 4 (Jul. 7, 2008). The statement — that revised section 219 would "become effective on August 1, 2008, and will be initially applied to the U2-Queue (this queue will close on July 31, 2008)" — came in response to a request for PJM to clarify its proposed implementation of a *different* section of its tariff, section 217.3a. The request did not mention, or seek clarification of, section 219. *See* R.7 at 6-7, 10-12 (West Deptford Answer) (JA __-__, __-__). Moreover, West Deptford was not a party to those proceedings and, although a West Deptford affiliate (LS Power Associates, L.P.) had intervened, the Commission has never before suggested that arguments made in a non-binding pleading could replace or modify the terms of a filed tariff.

The "notice" that West Deptford received is thus plainly inadequate: A statement buried in a pleading, in separate litigation, in response to a request for clarification about something else, cannot displace a legally filed rate. That kind of notice would not suffice even if given by an agency of the federal government. *Cf. Christopher v.*

41

*SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2166-67 (2012) (denying *Auer* deference to an agency's interpretation of its regulations when the interpretation was announced in amicus briefs in unrelated cases); *id.* at 2167 ("To defer to the agency's interpretation in this circumstance would seriously undermine the principle that agencies should provide regulated parties 'fair warning of the conduct [a regulation] prohibits or requires.'" (quoting *Gates & Fox Co. v. Occupational Safety & Health Review Comm'n*, 790 F.2d 154, 156 (D.C. Cir. 1986) (Scalia, J.)).   It certainly cannot suffice when given by a private party.

In any event, PJM's statement in its *Dominion* answer must yield to the plain language of its tariff.   *See* 16 U.S.C. § 824(d).   The Commission could have resolved this conflict by requiring PJM to file revised tariff language that conforms to the statement in its *Dominion* answer, but it did not.   *See, e.g.*, *Carolina Power & Light Co.*, 94 FERC ¶ 61,273 at 61,998 (2001).   Alternatively, PJM itself could have sought to amend its tariff to include an express "grandfather" provision making clear that the revised section 219 did not apply to interconnection requests pending in the queue, but it did not.   *See, e.g.*, *Midwest Indep. Transmission Sys. Operator, Inc.*, 124 FERC ¶ 61,183 at P 90 (2008)

(accepting tariff provisions that divided pending requests into four categories based on their status at the time the revised interconnection procedures became effective); *Edison Mission Energy v. Midwest Indep. Transmission Sys. Operator, Inc.*, 136 FERC ¶ 61,035 at PP 38-40 (2011) (similar); *Arizona Pub. Serv. Co.*, 137 FERC ¶ 61,099 at P 25 (2011) (accepting "proposal to grandfather existing interconnection request for interconnection customers for whom a feasibility study has been initiated"); *El Paso Elec. Serv. Co.*, 137 FERC ¶ 61,101 at P 25 (2011) (same). Had either of those things occurred, West Deptford and other affected parties would have had an opportunity to seek review of the proposed rule through ordinary channels. One cannot, however, seek review before the Commission or the Court of a dictum uttered by a utility in a pleading.

In short, under the Federal Power Act, West Deptford is entitled to rely on the terms of the tariff on file with the Commission. Statements made by PJM not reflected in the tariff cannot change what the tariff requires.

## II. The Commission's Orders Violate The Requirements Of Reasoned Decision-making.

Even if the Commission's orders did not violate the statutory requirements, they should still be set aside because they do not comply with the requirements of reasoned decision-making. In particular, the Commission's orders depart from its own precedent without a reasoned explanation, and they fail to provide any reasoned response to objections raised by West Deptford.

### A. The Commission's Orders Depart From Precedent Without Any Reasoned Explanation.

Federal agencies must provide a reasoned explanation when they depart from their own policies and precedents. *Fox*, 556 U.S. at 515 (an "agency may not . . . depart from a prior policy *sub silentio*" and must "show that there are good reasons for the new policy"); *Williams Gas Processing-Gulf Coast Co., L.P. v. FERC*, 475 F.3d 319, 322 (D.C. Cir. 2006) (vacating orders because "FERC neither explained its action as consistent with precedent nor justified it as a reasoned and permissible shift in policy"); *Environmental. Def. Fund, Inc. v. Costle*, 657 F. 2d 275, 289 (D.C. Cir. 1981). The Commission's orders do not satisfy that basic rule.

In earlier cases, the Commission has repeatedly held, consistent with the filed rate doctrine, that the terms and conditions applicable to a generator's request for interconnection service are those embodied in the tariff that is "effective and on file on the date that the interconnection agreement is executed or filed unexecuted." *MISO I*, 129 FERC ¶ 61,060 at P 62; *see also Midwest Indep. Transmission Sys. Operator, Inc. ("MISO II")*, 131 FERC ¶ 61,165 at P 32 (2010) (holding that the tariff on file applies only to the current service agreement, and any future service agreements are governed by "the cost allocation methodology . . . effective and on file on that date"); *MISO III*, 138 FERC ¶ 61,199 at P 42 & n.56 ("our basis for evaluating this filing is the tariff effective and on file at the time that the Interconnection Agreement was filed with the Commission and proposed to take effect"). Those holdings are consistent with the Commission's instructions that PJM's *pro forma* interconnection agreement must include "all of the standard terms and conditions that are part of the tariff *at the time the agreement is executed*." *PJM Interconnection, L.L.C.*, 108 FERC ¶ 61,025 at P 21 (2004) (emphasis added); *see also Shetek Wind Inc. v. Midwest Indep. Transmission Sys. Operator Inc.*, 138 FERC ¶ 61,250 at P 49 (2012) ("Rates, terms and

conditions of service must be specified in the Tariff, and such provisions must have received Commission approval prior to their implementation."). And they are consistent with PJM's own statement that the mere submission of an interconnection request or the execution of an agreement to undertake studies relating to that request do not "lock down" the then-applicable cost allocation rules or prevent PJM from changing its tariff requirements through an appropriate section 205 filing with the Commission before a final interconnection agreement is executed or filed unexecuted. *PJM Interconnection, L.L.C.*, Docket No. EL08-36-000, Reply Comments at 4, 6; *see also MidAmerican Energy Co.*, 116 FERC ¶ 61,018 at P 13 & n.14 (2006).

Indeed, even in the specific context of Network Upgrade 28, the Commission has previously indicated that the applicable tariff is the "PJM tariff in effect at the time" an interconnection service agreement is executed or filed unexecuted. *See Marcus Hook III*, 118 FERC ¶ 61,169 at P 10. The Commission explained on remand from *FPL Energy Marcus Hook, L.P. v. FERC*, 430 F.3d 441 (D.C. Cir. 2005), that, in determining whether Network Upgrade 28 provided any system benefits, the tariff version that applied was the tariff in effect at the time Marcus Hook

executed its interconnection agreement with PJM.  *See Marcus Hook IV*, 123 FERC ¶ 61,289 at PP 77-80 (at the time Marcus Hook executed its agreement "with PJM in January 2002, the version of section 37.2 of the PJM tariff was the '2001 version,' rather than the '2003 version'" and therefore "that version of section 37.2 properly governs the relationship between the parties . . . .").

The Commission's orders deny that the Commission has departed from precedent; instead, they attempt to distinguish the Commission's earlier cases on the theory that the Commission is entitled to make a case-by-case judgment as to what is just and reasonable.  Accordingly, in its order on rehearing, the Commission announced that it "do[es] not find that" its earlier precedents "establish a single policy to address all of the myriad issues that may arise from a change to cost allocation in the interconnection process."  139 FERC ¶ 61,184 at P 38 (JA __).  Instead, according to the Commission, "[i]n each case," it "must evaluate the filing made by the utility, including the utility's proposal as to applicability to existing queue participants to determine whether that proposal is just and reasonable."  *Id.*

Those statements are all *ipse dixit*. The Commission has conveniently announced that it has the power to make a discretionary judgment about whether the filed rate should be respected when a utility proposes to ignore it, but it has made no effort to explain how that authority can be squared with either the Federal Power Act or its own earlier precedents. The filed rate doctrine promotes predictability and uniformity in a regulated industry; those conditions are incompatible with a system in which the filed rate can be dispensed with according to the length of the chancellor's foot.

To be sure, the Commission's orders assert that in other cases the Commission has exercised discretion to determine whether any proposed rate is just and reasonable. *See* 139 FERC ¶ 61,184 at PP 39-41 (JA __). But none of the precedents cited by the Commission are analogous; in all of them the decision to deviate from the standardized agreement was reflected and approved in a filed tariff. *See, e.g., Critical Path Transmission LLC v. California Indep. Sys. Op. Corp.*, 135 FERC ¶ 61,031 at P 44 (2011) (noting the Commission had previously approved tariff changes setting out method for handling pending requests); *see also Interconnecting Queuing Practices*, 122 FERC ¶ 61,252 at PP 11-13

48

(2008) (discussing the "two forms" of reforms "necessitating tariff changes"). In none of the cases cited in the Commission's orders did the Commission apply a superseded tariff that was no longer in effect based only on statements made by the utility in an "answer" not reflected in the filed tariff. If PJM had wanted to apply old tariff provisions to earlier queue requests, it needed to reflect that proposal in the filed tariff itself.

Indeed, the Commission's interpretation of its own cases only confirms that the Commission has departed from settled law. The filed rate doctrine limits the *Commission's* actions, not just those of regulated entities, and neither courts nor the agency have discretion to charge anything other than the rate on file with the Commission. *Exxon Mobil*, 571 F.3d at 1211 (the filed rate doctrine "limit[s] the relief FERC may order"). The Commission may not decide that it has discretion to permit a public utility to violate the filed rate doctrine so long as the replacement rate is "just and reasonable." *See id.* (the Commission "may not retroactively alter a filed rate to compensate for prior over- or under-payments"). Many possible rates, regulations, and practices are within the bounds of what might be just and reasonable; but only one rate is on

file at any given time. The filed rate doctrine requires that *that* rate, and not some other just and reasonable rate, be the one that is charged.

## B. The Commission's Orders Do Not Reasonably Respond To West Deptford's Objections.

The Commission's orders are also arbitrary and capricious because they fail to provide any meaningful response to West Deptford's objection that, assuming PJM is not required to comply with the filed rate, West Deptford is entitled to an offset to account for the incremental auction revenue rights already exercised by Marcus Hook and Liberty Electric. *Cf. State Farm*, 463 U.S. at 43. That offset is necessary to prevent the discriminatory windfall that would otherwise result: If Marcus Hook and Liberty Electric are ultimately compensated *in full* by West Deptford in the amount of $10 million for the network upgrade, but allowed to retain the proceeds from the auction revenue rights they exercised in past years, they will have received a substantial, anti-competitive windfall at West Deptford's expense.

Auction revenue rights exist to correct for the problem of double charging. Under its tariff, PJM requires a generator to pay for a network upgrade if it is the "but for" cause of that upgrade, *and* it also requires the generator to pay a cost-based charge for transmission service. But as

explained above, the Commission's rules prohibit this kind of "and" pricing, under which a utility pays twice for the same service — *i.e.*, "where a customer pays for use of the grid at its incremental expansion cost and later is also charged for use of the grid at its average cost." *Entergy Servs.*, 319 F.3d at 542.

To avoid violating that prohibition, PJM's tariff grants incremental auction revenue rights to each generator that pays for a network upgrade.  At a yearly financial transmission rights auction, PJM sells certain financial rights that entitle the holder to hedge against the risk of congestion in the transmission line.  *See* PJM Manual 06, Financial Transmission Rights 11, 41 (2012), http://www.pjm.com/~/media/documents/manuals/m06.ashx.  Holders of auction revenue rights, in turn, receive a portion of the proceeds of those sales.  *Id.* at 14.  Over time, receiving those proceeds is designed to cure the double-charging problem because the congestion charges are purportedly equivalent to the increase in network-use charges paid by the generator that constructed the network upgrade.  *See* Order No. 2003, FERC Stats. & Regs. ¶ 31,146 at P 700; *Marcus Hook III*, 118 FERC ¶ 61,169 at PP 32-34.

"If you need to take a deep breath after all that, you're not alone." *Kloeckner v. Solis*, 568 U.S. __ (Dec. 10, 2012) (slip op. at 10). The short version is that PJM makes customers who construct network upgrades pay twice, but then gives back some of the money, in amounts that bear some relationship to the increased costs those customers pay to use the upgraded grid.

Accordingly, although only PJM, Marcus Hook, and Liberty Electric are privy to the precise figures, every year since 2004 Marcus Hook and Liberty Electric have each been entitled to receive part of the money generated by the yearly auction in compensation for their expenses in funding Network Upgrade 28. For example, PJM informed the Commission in 2004 that Marcus Hook's rights, assuming it exercised them that year, would have been valued at approximately $600,000. *FPL Energy Marcus Hook, L.P. v. PJM Interconnection, L.L.C.*, Docket No. EL04-57-000, PJM Response at 2 (May 19, 2004). Liberty Electric was also eligible for its share of this revenue, as it partially funded Network Upgrade 28. PJM Tariff § 231.3 (JA __). That is money that Marcus Hook and Liberty Electric have already received

and will *keep* regardless of whether their auction revenue rights are reassigned to West Deptford in the future.

The Commission's orders fail to acknowledge the importance of these facts. Nor do they provide any reasoned explanation why it is permissible to require West Deptford to reimburse Marcus Hook and Liberty Electric for the *full* network upgrade cost when those companies have already received reimbursement as a result of exercising their auction revenue rights. In response to West Deptford's arguments, *see* R.4 at 36-37 (West Deptford Protest) (JA __), the Commission merely stated that West Deptford's *own* claim for auction revenue rights was "not yet ripe," 136 FERC ¶ 61,195 at P 43 (JA __), because under section 231.4 of PJM's tariff, West Deptford is not entitled to receive any auction rights itself until it has executed an interconnection service agreement. *See* PJM Tariff § 231.4 (JA __). It also asserted in conclusory fashion that it would not authorize any double recovery. 139 FERC ¶ 61,184 at P 59 (JA __).

But that is non-responsive to West Deptford's principal objection, which focused on its competitors' *past reimbursement* from the exercise of their auction revenue rights, not on West Deptford's own future

53

entitlement to those rights. As West Deptford explained, the Commission should have "offset against West Deptford's cost responsibility the substantial revenues that [Marcus Hook] and [Liberty Electric] have *already received* in connection with these rights," and that the failure to do so was "unjust and unreasonable, and unduly preferential and discriminatory." R.9 at 5, 25 (West Deptford Reh'g Pet.) (emphasis added) (JA __). Section 231.4 has nothing to do with the revenue Marcus Hook and Liberty Electric *already received* by virtue of holding revenue rights during past auctions. The Commission's failure to give any explanation at all for this discriminatory treatment, let alone a reasoned one, is arbitrary and capricious.

*   *   *   *

The Federal Power Act's provisions are designed to prevent undue discrimination and other abuses, and to render rates definite and certain. They do that by requiring utilities to charge only those rates that have been included in tariffs that are publicly filed with the Commission. That doctrine is indispensable; any other approach would open the door for utilities (and the Commission) to engage in precisely the types of favoritism and undue discrimination that Congress has

54

sought to prevent.  In this case, because the Commission's orders violate the filed rate doctrine, they should be set aside.

## CONCLUSION

The petition for review should be granted, and the Commission's orders should be vacated.

Respectfully submitted,

_/s/ Ashley C. Parrish_

Neil L. Levy                              Ashley C. Parrish
Stephanie L. Lim                          *Counsel of Record*
KING & SPALDING LLP                       Matthew S. Owen
1700 Pennsylvania Avenue, N.W.            Karen F. Grohman
Washington, D.C.  20006                   KING & SPALDING LLP
Telephone: (202) 626-5452                 1700 Pennsylvania Avenue, N.W.
Facsimile: (202) 737-0500                 Washington, D.C.  20006
Email: nlevy@kslaw.com                    Telephone: (202) 626-2627
Email: slim@kslaw.com                     Facsimile: (202) 626-3737
                                          Email: aparrish@kslaw.com
                                          Email: mowen@kslaw.com
                                          Email: kgrohman@kslaw.com


*Counsel for petitioner West Deptford Energy, LLC*

Dated: December 11, 2012

55

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure And Circuit Rule 32(a)(2), I hereby certify that the textual portion of the foregoing brief (exclusive of the disclosure statement, tables of contents and authorities, certificates of service and compliance, but including footnotes) contains 10,512 words as determined by the word-counting feature of Microsoft Word 2000.

           /s/ Ashley C. Parrish
           Ashley C. Parrish

DATED: December 11, 2012

# ADDENDUM

**ADDENDUM OF STATUTORY AND REGULATORY PROVISIONS**

In accordance with Rule 28 of the Federal Rules of Appellate Procedure, and D.C. Circuit Rule 28(a)(5), this Addendum sets forth the relevant parts of the pertinent statutes and regulations cited in petitioners' opening brief.

## TABLE OF CONTENTS

Section 201 of the Federal Power Act,
    16 U.S.C. § 824 ................................................................... App-1

Section 205 of the Federal Power Act,
    16 U.S.C. § 824d ................................................................ App-5

Section 206 of the Federal Power Act,
    16 U.S.C. § 824e ............................................................... App-9

18 C.F.R. § 35.1 ...................................................................... App-14

## Section 201 of the Federal Power Act, 16 U.S.C. § 824

### Declaration of policy; application of subchapter

(a) Federal regulation of transmission and sale of electric energy

It is declared that the business of transmitting and selling electric energy for ultimate distribution to the public is affected with a public interest, and that Federal regulation of matters relating to generation to the extent provided in this subchapter and subchapter III of this chapter and of that part of such business which consists of the transmission of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce is necessary in the public interest, such Federal regulation, however, to extend only to those matters which are not subject to regulation by the States.

(b) Use or sale of electric energy in interstate commerce

(1) The provisions of this subchapter shall apply to the transmission of electric energy in interstate commerce and to the sale of electric energy at wholesale in interstate commerce, but except as provided in paragraph (2) shall not apply to any other sale of electric energy or deprive a State or State commission of its lawful authority now exercised over the exportation of hydroelectric energy which is transmitted across a State line. The Commission shall have jurisdiction over all facilities for such transmission or sale of electric energy, but shall not have jurisdiction, except as specifically provided in this subchapter and subchapter III of this chapter, over facilities used for the generation of electric energy or over facilities used in local distribution or only for the transmission of electric energy in intrastate commerce, or over facilities for the transmission of electric energy consumed wholly by the transmitter.

(2) Notwithstanding subsection (f) of this section, the provisions of sections 824b(a)(2), 824e(e), 824i, 824j, 824j–1, 824k, 824*o*, 824p, 824q, 824r, 824s, 824t, 824u, and 824v of this title shall apply to the entities described in such provisions, and such entities shall be subject to the jurisdiction of the Commission for purposes of carrying out such provisions and for purposes of applying the enforcement authorities of this chapter with respect to such provisions. Compliance with any order or rule of the Commission under the provisions of section 824b(a)(2), 824e(e), 824i, 824j, 824j–1, 824k, 824*o*, 824p, 824q, 824r, 824s, 824t, 824u, or 824v of this title, shall not make an electric utility or other entity subject to the jurisdiction of the Commission for any purposes other than the purposes specified in the preceding sentence.

(c) Electric energy in interstate commerce

For the purpose of this subchapter, electric energy shall be held to be transmitted in interstate commerce if transmitted from a State and consumed at any point outside thereof; but only insofar as such transmission takes place within the United States.

(d) "Sale of electric energy at wholesale" defined

The term "sale of electric energy at wholesale" when used in this subchapter, means a sale of electric energy to any person for resale.

(e) "Public utility" defined

The term "public utility" when used in this subchapter and subchapter III of this chapter means any person who owns or operates facilities subject to the jurisdiction of the Commission under this subchapter (other than facilities subject to such jurisdiction solely by reason of section 824e(e), 824e(f), 824i, 824j, 824j–1, 824k, 824*o*, 824p, 824q, 824r, 824s, 824t, 824u, or 824v of this title).

App-2

(f) United States, State, political subdivision of a State, or agency or instrumentality thereof exempt

No provision in this subchapter shall apply to, or be deemed to include, the United States, a State or any political subdivision of a State, an electric cooperative that receives financing under the Rural Electrification Act of 1936 (7 U.S.C. 901 et seq.) or that sells less than 4,000,000 megawatt hours of electricity per year, or any agency, authority, or instrumentality of any one or more of the foregoing, or any corporation which is wholly owned, directly or indirectly, by any one or more of the foregoing, or any officer, agent, or employee of any of the foregoing acting as such in the course of his official duty, unless such provision makes specific reference thereto.

(g) Books and records

(1) Upon written order of a State commission, a State commission may examine the books, accounts, memoranda, contracts, and records of—

(A) an electric utility company subject to its regulatory authority under State law,

(B) any exempt wholesale generator selling energy at wholesale to such electric utility, and

(C) any electric utility company, or holding company thereof, which is an associate company or affiliate of an exempt wholesale generator which sells electric energy to an electric utility company referred to in subparagraph (A),

wherever located, if such examination is required for the effective discharge of the State commission's regulatory responsibilities affecting the provision of electric service.

App-3

(2) Where a State commission issues an order pursuant to paragraph (1), the State commission shall not publicly disclose trade secrets or sensitive commercial information.

(3) Any United States district court located in the State in which the State commission referred to in paragraph (1) is located shall have jurisdiction to enforce compliance with this subsection.

(4) Nothing in this section shall—

(A) preempt applicable State law concerning the provision of records and other information; or

(B) in any way limit rights to obtain records and other information under Federal law, contracts, or otherwise.

(5) As used in this subsection the terms "affiliate", "associate company", "electric utility company", "holding company", "subsidiary company", and "exempt wholesale generator" shall have the same meaning as when used in the Public Utility Holding Company Act of 2005 [42 U.S.C. 16451 et seq.].

## Section 205 of the Federal Power Act, 16 U.S.C. § 824d

### Rates and charges; schedules; suspension of new rates; automatic adjustment clauses

(a) Just and reasonable rates

All rates and charges made, demanded, or received by any public utility for or in connection with the transmission or sale of electric energy subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges shall be just and reasonable, and any such rate or charge that is not just and reasonable is hereby declared to be unlawful.

(b) Preference or advantage unlawful

No public utility shall, with respect to any transmission or sale subject to the jurisdiction of the Commission, (1) make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage, or (2) maintain any unreasonable difference in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service.

(c) Schedules

Under such rules and regulations as the Commission may prescribe, every public utility shall file with the Commission, within such time and in such form as the Commission may designate, and shall keep open in convenient form and place for public inspection schedules showing all rates and charges for any transmission or sale subject to the jurisdiction of the Commission, and the classifications, practices, and regulations affecting such rates and charges, together with all contracts which in any manner affect or relate to such rates, charges, classifications, and services.

(d) Notice required for rate changes

Unless the Commission otherwise orders, no change shall be made by any public utility in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after sixty days' notice to the Commission and to the public. Such notice shall be given by filing with the Commission and keeping open for public inspection new schedules stating plainly the change or changes to be made in the schedule or schedules then in force and the time when the change or changes will go into effect. The Commission, for good cause shown, may allow changes to take effect without requiring the sixty days' notice herein provided for by an order specifying the changes so to be made and the time when they shall take effect and the manner in which they shall be filed and published.

(e) Suspension of new rates; hearings; five-month period

Whenever any such new schedule is filed the Commission shall have authority, either upon complaint or upon its own initiative without complaint, at once, and, if it so orders, without answer or formal pleading by the public utility, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, charge, classification, or service; and, pending such hearing and the decision thereon, the Commission, upon filing with such schedules and delivering to the public utility affected thereby a statement in writing of its reasons for such suspension, may suspend the operation of such schedule and defer the use of such rate, charge, classification, or service, but not for a longer period than five months beyond the time when it would otherwise go into effect; and after full hearings, either completed before or after the rate, charge, classification, or service goes into effect, the Commission may make such orders with reference thereto as would be proper in a proceeding initiated after it had become effective. If the proceeding has not been concluded and an order made at the expiration of such five months, the proposed change of rate,

App-6

charge, classification, or service shall go into effect at the end of such period, but in case of a proposed increased rate or charge, the Commission may by order require the interested public utility or public utilities to keep accurate account in detail of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts are paid, and upon completion of the hearing and decision may by further order require such public utility or public utilities to refund, with interest, to the persons in whose behalf such amounts were paid, such portion of such increased rates or charges as by its decision shall be found not justified. At any hearing involving a rate or charge sought to be increased, the burden of proof to show that the increased rate or charge is just and reasonable shall be upon the public utility, and the Commission shall give to the hearing and decision of such questions preference over other questions pending before it and decide the same as speedily as possible.

(f) Review of automatic adjustment clauses and public utility practices; action by Commission; "automatic adjustment clause" defined

(1) Not later than 2 years after November 9, 1978, and not less often than every 4 years thereafter, the Commission shall make a thorough review of automatic adjustment clauses in public utility rate schedules to examine—

(A) whether or not each such clause effectively provides incentives for efficient use of resources (including economical purchase and use of fuel and electric energy), and

(B) whether any such clause reflects any costs other than costs which are—

(i) subject to periodic fluctuations and

(ii) not susceptible to precise determinations in rate cases prior to the time such costs are incurred.

Such review may take place in individual rate proceedings or in generic or other separate proceedings applicable to one or more utilities.

(2) Not less frequently than every 2 years, in rate proceedings or in generic or other separate proceedings, the Commission shall review, with respect to each public utility, practices under any automatic adjustment clauses of such utility to insure efficient use of resources (including economical purchase and use of fuel and electric energy) under such clauses.

(3) The Commission may, on its own motion or upon complaint, after an opportunity for an evidentiary hearing, order a public utility to—

(A) modify the terms and provisions of any automatic adjustment clause, or

(B) cease any practice in connection with the clause,

if such clause or practice does not result in the economical purchase and use of fuel, electric energy, or other items, the cost of which is included in any rate schedule under an automatic adjustment clause.

(4) As used in this subsection, the term "automatic adjustment clause" means a provision of a rate schedule which provides for increases or decreases (or both), without prior hearing, in rates reflecting increases or decreases (or both) in costs incurred by an electric utility. Such term does not include any rate which takes effect subject to refund and subject to a later determination of the appropriate amount of such rate.

## Section 206 of the Federal Power Act, 16 U.S.C. § 824e

### Power of Commission to fix rates and charges; determination of cost of production or transmission

(a) Unjust or preferential rates, etc.; statement of reasons for changes; hearing; specification of issues

Whenever the Commission, after a hearing held upon its own motion or upon complaint, shall find that any rate, charge, or classification, demanded, observed, charged, or collected by any public utility for any transmission or sale subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order. Any complaint or motion of the Commission to initiate a proceeding under this section shall state the change or changes to be made in the rate, charge, classification, rule, regulation, practice, or contract then in force, and the reasons for any proposed change or changes therein. If, after review of any motion or complaint and answer, the Commission shall decide to hold a hearing, it shall fix by order the time and place of such hearing and shall specify the issues to be adjudicated.

(b) Refund effective date; preferential proceedings; statement of reasons for delay; burden of proof; scope of refund order; refund orders in cases of dilatory behavior; interest

Whenever the Commission institutes a proceeding under this section, the Commission shall establish a refund effective date. In the case of a proceeding instituted on complaint, the refund effective date shall not be earlier than the date of the filing of such complaint nor later than 5

months after the filing of such complaint. In the case of a proceeding instituted by the Commission on its own motion, the refund effective date shall not be earlier than the date of the publication by the Commission of notice of its intention to initiate such proceeding nor later than 5 months after the publication date. Upon institution of a proceeding under this section, the Commission shall give to the decision of such proceeding the same preference as provided under section 824d of this title and otherwise act as speedily as possible. If no final decision is rendered by the conclusion of the 180-day period commencing upon initiation of a proceeding pursuant to this section, the Commission shall state the reasons why it has failed to do so and shall state its best estimate as to when it reasonably expects to make such decision. In any proceeding under this section, the burden of proof to show that any rate, charge, classification, rule, regulation, practice, or contract is unjust, unreasonable, unduly discriminatory, or preferential shall be upon the Commission or the complainant. At the conclusion of any proceeding under this section, the Commission may order refunds of any amounts paid, for the period subsequent to the refund effective date through a date fifteen months after such refund effective date, in excess of those which would have been paid under the just and reasonable rate, charge, classification, rule, regulation, practice, or contract which the Commission orders to be thereafter observed and in force: Provided, That if the proceeding is not concluded within fifteen months after the refund effective date and if the Commission determines at the conclusion of the proceeding that the proceeding was not resolved within the fifteen-month period primarily because of dilatory behavior by the public utility, the Commission may order refunds of any or all amounts paid for the period subsequent to the refund effective date and prior to the conclusion of the proceeding. The refunds shall be made, with interest, to those persons who have paid those rates or charges which are the subject of the proceeding.

(c) Refund considerations; shifting costs; reduction in revenues; "electric utility companies" and "registered holding company" defined

Notwithstanding subsection (b) of this section, in a proceeding commenced under this section involving two or more electric utility companies of a registered holding company, refunds which might otherwise be payable under subsection (b) of this section shall not be ordered to the extent that such refunds would result from any portion of a Commission order that (1) requires a decrease in system production or transmission costs to be paid by one or more of such electric companies; and (2) is based upon a determination that the amount of such decrease should be paid through an increase in the costs to be paid by other electric utility companies of such registered holding company: Provided, That refunds, in whole or in part, may be ordered by the Commission if it determines that the registered holding company would not experience any reduction in revenues which results from an inability of an electric utility company of the holding company to recover such increase in costs for the period between the refund effective date and the effective date of the Commission's order. For purposes of this subsection, the terms "electric utility companies" and "registered holding company" shall have the same meanings as provided in the Public Utility Holding Company Act of 1935, as amended.1

(d) Investigation of costs

The Commission upon its own motion, or upon the request of any State commission whenever it can do so without prejudice to the efficient and proper conduct of its affairs, may investigate and determine the cost of the production or transmission of electric energy by means of facilities under the jurisdiction of the Commission in cases where the Commission has no authority to establish a rate governing the sale of such energy.

(e) Short-term sales

(1) In this subsection:

> (A) The term "short-term sale" means an agreement for the sale of electric energy at wholesale in interstate commerce that is for a period of 31 days or less (excluding monthly contracts subject to automatic renewal).

> (B) The term "applicable Commission rule" means a Commission rule applicable to sales at wholesale by public utilities that the Commission determines after notice and comment should also be applicable to entities subject to this subsection.

(2) If an entity described in section 824(f) of this title voluntarily makes a short-term sale of electric energy through an organized market in which the rates for the sale are established by Commission-approved tariff (rather than by contract) and the sale violates the terms of the tariff or applicable Commission rules in effect at the time of the sale, the entity shall be subject to the refund authority of the Commission under this section with respect to the violation.

(3) This section shall not apply to—

> (A) any entity that sells in total (including affiliates of the entity) less than 8,000,000 megawatt hours of electricity per year; or

> (B) an electric cooperative.

(4)(A) The Commission shall have refund authority under paragraph (2) with respect to a voluntary short term sale of electric energy by the Bonneville Power Administration only if the sale is at an unjust and unreasonable rate.

> (B) The Commission may order a refund under subparagraph (A) only for short-term sales made by the Bonneville Power Administration at rates that are

App-12

higher than the highest just and reasonable rate charged by any other entity for a short-term sale of electric energy in the same geographic market for the same, or most nearly comparable, period as the sale by the Bonneville Power Administration.

(C) In the case of any Federal power marketing agency or the Tennessee Valley Authority, the Commission shall not assert or exercise any regulatory authority or power under paragraph (2) other than the ordering of refunds to achieve a just and reasonable rate.

# TITLE 18 — CONSERVATION OF POWER AND WATER RESOURCES

# CHAPTER I — FEDERAL ENERGY REGULATORY COMMISSION, DEPARTMENT OF ENERGY

# SUBCHAPTER B — REGULATIONS UNDER THE FEDERAL POWER ACT

# PART 35 — FILING OF RATE SCHEDULES AND TARIFFS

## Subpart A — Application

## Section 35.1 Application; obligation to file rate schedules, tariffs and certain service agreements.

(a) Every public utility shall file with the Commission and post, in conformity with the requirements of this part, full and complete rate schedules and tariffs and those service agreements not meeting the requirements of § 35.1(g), clearly and specifically setting forth all rates and charges for any transmission or sale of electric energy subject to the jurisdiction of this Commission, the classifications, practices, rules and regulations affecting such rates, charges, classifications, services, rules, regulations or practices, as required by section 205(c) of the Federal Power Act (49 Stat. 851; 16 U.S.C. 824d(c)). Where two or more public utilities are parties to the same rate schedule or tariff, each public utility transmitting or selling electric energy subject to the jurisdiction of this Commission shall post and file such rate schedule, or the rate schedule may be filed by one such public utility and all other parties having an obligation to file may post and file a certificate of concurrence on the form indicated in § 131.52 of this chapter: Provided, however, In cases where two or more public utilities are required to file rate schedules or certificates of concurrence such public utilities may authorize a designated representative to file upon behalf of all parties if upon written request such parties have been granted Commission authorization therefor.

(b) A rate schedule, tariff, or service agreement applicable to a transmission or sale of electric energy, other than that which proposes to supersede, cancel or otherwise change the provisions of a rate

schedule, tariff, or service agreement required to be on file with this Commission, shall be filed as an initial rate in accordance with § 35.12.

(c) A rate schedule, tariff, or service agreement applicable to a transmission or sale of electric energy which proposes to supersede, cancel or otherwise change any of the provisions of a rate schedule, tariff, or service agreement required to be on file with this Commission (such as providing for other or additional rates, charges, classifications or services, or rules, regulations, practices or contracts for a particular customer or customers) shall be filed as a change in rate in accordance with § 35.13, except cancellation or termination which shall be filed as a change in accordance with § 35.15.

(d)(1) The provisions of this paragraph (d) shall apply to rate schedules, tariffs or service agreements tendered for filing on or after August 1, 1976, which are applicable to the transmission or sale of firm power for resale to an all-requirements customer, whether tendered pursuant to § 35.12 as an initial rate schedule or tendered pursuant to § 35.13 as a change in an existing rate schedule whose term has expired or whose term is to be extended.

(2) Rate schedules covered by the terms of paragraph (d)(1) of this section shall contain the following provision when it is the intent of the contracting parties to give the party furnishing service the unrestricted right to file unilateral rate changes under section 205 of the Federal Power Act:

Nothing contained herein shall be construed as affecting in any way the right of the party furnishing service under this rate schedule to unilaterally make application to the Federal Energy Regulatory Commission for a change in rates under section 205 of the Federal Power Act and pursuant to the Commission's Rules and Regulations promulgated thereunder.

(3) Rate schedules covered by the terms of paragraph (d)(1) of this section shall contain the following provision when it is the intent of the contracting parties to withhold from the party furnishing service the right to file any unilateral rate changes under section 205 of the Federal Power Act:

The rates for service specified herein shall remain in effect for the term of _____ or until _____, and shall not be subject to change through application to the Federal Energy Regulatory Commission pursuant to the provisions of Section 205 of the Federal Power Act absent the agreement of all parties thereto.

(4) Rate schedules covered by the terms of paragraph (d)(1) of this section, but which are not covered by paragraphs (d)(2) or (d)(3) of this section, are not required to contain either of the boilerplate provisions set forth in paragraph (d)(2) or (d)(3) of this section.

(e) No public utility shall, directly or indirectly, demand, charge, collect or receive any rate, charge or compensation for or in connection with electric service subject to the jurisdiction of the Commission, or impose any classification, practice, rule, regulation or contract with respect thereto, which is different from that provided in a rate schedule required to be on file with this Commission unless otherwise specifically provided by order of the Commission for good cause shown.

(f) A rate schedule applicable to the sale of electric power by a public utility to the Bonneville Power Administration under section 5(c) of the Pacific Northwest Electric Power Planning and Conservation Act (Pub. L. No. 96-501 (1980)) shall be filed in accordance with subpart D of this part.

(g) For the purposes of paragraph (a) of this section, any service agreement that conforms to the form of service agreement that is part of the public utility's approved tariff pursuant to § 35.10a of this chapter and any market-based rate agreement pursuant to a tariff shall not be filed with the Commission. All agreements must, however, be retained and be made available for public inspection and copying at the public utility's business office during regular business hours and provided to the Commission or members of the public upon request. Any individually executed service agreement for transmission, cost-based power sales, or other generally applicable services that deviates in any material respect from the applicable form of service agreement contained in the public utility's tariff and all unexecuted agreements under which service will commence at the request of the customer, are subject to the filing requirements of this part.

## CERTIFICATE OF SERVICE

Pursuant to Rule 25 of the Federal Rules of Appellate Procedure, I hereby certify that I have this 11th day of December 2012, served a copy of the foregoing documents electronically through the Court's CM/ECF system on all registered counsel.

 /s/ Ashley C. Parrish
Ashley C. Parrish